**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JON SADER, SADER POWER LLC & SADER POWER ENTERPRISES, LLC** *Plaintiffs,* **versus** **DAVID E. GRISWOLD & GRISWOLD POWER, LLC** *Defendants.* | CIVIL ACTION NO.: JUDGE MAGISTRATE JUDGE JURY TRIAL DEMANDED |

## COMPLAINT FOR DAMAGES AND ATTORNEYS' FEES

Plaintiffs Jon Sader ("Sader"), Sader Power LLC ("Sader Power"), and Sader Power Enterprises LLC ("SPE") bring this action against Defendants David E. Griswold ("Griswold") and Griswold Power, LLC ("Griswold Power"), and allege as follows:

## PARTIES

### 1.

Upon information and belief, David E. Griswold, an individual of the full age of majority, is a resident and domiciliary of California.

### 2.

Griswold Power is a limited liability company formed by written agreement effective November 30, 2011, under the laws of Louisiana with its principal place of business in Baton Rouge, Louisiana. Its members were (prior to December 2012) two (2) limited liability companies formed under the laws of, and citizens of, the State of California (DEG Ventures, LLC ["DEGV"], and DEG Energy, LLC ["DEGE"]. Griswold Power conducts business in Louisiana.

3.

David Griswold was the manager and majority member of both DEGV and DEGE. Griswold conducted business in Louisiana and filed certain individual (personal) State of Louisiana income tax returns in Louisiana during the time period when the events giving rise to the claims in this litigation occurred. Upon information and belief, Griswold continues to conduct business in Louisiana.

4.

Upon information and belief, from December 2012 until the present, the sole member of Griswold Power is Harry Yates (as resident and domiciliary of Oregon) in his capacity as Trustee of The David E. Griswold Special Asset Trust, est. Dec. 12, 2012.

5.

Plaintiff Jon Sader is an individual of the full age of majority and is a resident and domiciliary of Michigan.

6.

Plaintiff Sader Power, LLC, is a limited liability company formed under the laws of Louisiana, and is a citizen of the State of Michigan.

7.

Plaintiff Sader Power Enterprises, LLC, is a limited liability company formed under the laws of Louisiana, and is a citizen of the State of Michigan.

## JURISDICTION AND VENUE

8.

Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

9.

Venue is proper in the Court under 28 U.S.C. § 1391(b)(2) because nearly all of the events giving rise to the claims occurred within the boundaries of the Eastern District of Louisiana.

## GENERAL ALLEGATIONS

10.

SPE is engaged in the business of sales, construction, installation, maintenance, and monitoring of residential solar power equipment. In addition, SPE serves as a consultant to other individuals and businesses on the uses and installation of solar power equipment.

11.

Sader Power was at all relevant times engaged in the business of consulting with individuals and business entities on various green energy initiatives, including residential solar power.

12.

At all relevant times, Griswold Power was and continues to be engaged in the business of purchasing solar power equipment for homes and businesses.

13.

During his business relationship with Sader, Sader Power, and SPE, Griswold personally traveled to Louisiana to conduct business and discuss the ongoing solar panel array business on several occasions, at least four times a year.

14.

In addition to his Louisiana visits, Griswold ran the business of Griswold Power by daily phone calls placed and emails sent to Louisiana.

### The Agreement Between Griswold and Sader
### to Pursue Tax Benefits Available for Solar Panel Arrays

15.

In early 2011, several months before the formation of Griswold Power, Sader, Griswold, and Griswold's personal representatives engaged in extensive meetings, discussions, and communications for the purpose of entering into business together in several green business possibilities in and around the New Orleans, Louisiana, area.

16.

Griswold and Sader eventually agreed that the best possibility for a successful green business in Louisiana was for the installation of solar panels on residential and commercial properties.

17.

Griswold and Sader agreed that the success of any solar panel installation business depended upon the availability of certain federal government reimbursement payments and federal/state tax benefits, including: (1) benefits arising from Section 1603 of the American Recovery and Reinvestment Tax Act of 2009 ("Section 1603"); (2) benefits arising from the federal Investment Tax Credit ("ITC") provided for under § 25D of the Internal Revenue Code ("IRC"); 3) federal and Louisiana income tax benefits, including accelerated and regular depreciation; and 4) tax credits provided by the State of Louisiana.

### The Federal Section 1603 Payment Program

18.

Section 1603 was intended to encourage renewable energy projects such as the sale, installation, and use of residential solar panel arrays.

19.

Under the 1603 program, owners of energy projects are paid cash payments equal to thirty percent (30%) of the cost basis paid for eligible energy properties ("1603 Payment").

20.

To qualify for Section 1603 Payments, construction of the energy property must have commenced before December 31, 2011.

21.

Alternatively, the Section 1603 program guidance provides in part that construction is considered commenced if (i) "physical work of a significant nature" was completed by December 31, 2011; or (ii) more than five percent (5%) of the total cost of the eligible property was "paid or incurred" by December 31, 2011, and a binding contract for construction is in place ("5% Safe Harbor rule").

22.

The program guidance provides that to apply for Section 1603 payments under the 5% Safe Harbor rule, owners must submit paid invoices and/or other financial documents demonstrating: (1) that more than five percent (5%) of the total cost of the energy property (i.e., solar panel array) has been incurred or paid by the applicant; and (2) the existence of a binding contract for construction of the array.

23.

Once the application is submitted by the owner, the federal government assigns each array a Treasury Application Number ("TAN").

24.

Section 1603 guidance requires that the "begun construction document" and associated assigned TAN be affixed to the project before October 1, 2012.

25.

Section 1603 benefits are subject to recapture if disposed of to a disqualified person or if a disqualifying event occurs, and may be disallowed if an applicant materially fails to comply with program conditions.

## Federal Investment Tax Credit

26.

As an alternative to Section 1603, purchasers of solar arrays may be entitled to a federal ITC equal to thirty percent (30%) of the cost of the arrays.

27.

Utilizing the ITC results in a dollar-for-dollar reduction in the income taxes that a person or company claiming the credit would otherwise pay the federal government.

28.

Owners of solar arrays may take advantage of the Section 1603 program or the ITC, but not both on the same solar array.

## Income Tax Benefit: Accelerated
## Depreciation and Bonus Depreciation

29.

In addition to the Section 1603 cash payment or, alternatively, the ITC, Griswold Power was eligible to take tax deductions for accelerated depreciation and bonus depreciation.

30.

Owners of solar arrays received valuable income tax deductions which either reduced the owners' income taxes due or resulted in cash refunds of taxes already paid as follows:

<u>Arrays Purchased in 2011</u>

A)    Owners who opted for 1603 Payments could take accelerated depreciation plus bonus depreciation equal to one hundred percent (100%) of the cost of the solar array in the year of purchase.

B)    Owners who opted for ITC rather than 1603 Payments could take accelerated depreciation plus bonus depreciation equal to eighty-five percent (85%) of the cost of the solar array in the year of purchase.

<u>Arrays Purchased in 2012</u>

A)    Owners who opted for 1603 Payments could take accelerated depreciation plus bonus depreciation equal to sixty percent (60%) of the cost of the solar array in the year of purchase.

B)    Owners who opted for ITC rather than 1603 Payments could take accelerated depreciation plus bonus depreciation equal to sixty percent (60%) of the cost of the solar array in the year of purchase.

<u>Arrays Purchased in 2013</u>

A)    Owners who opted for 1603 Payments could take accelerated depreciation plus bonus depreciation equal to sixty percent (60%) of the cost of the solar array in the year of purchase.

B)    Owners who opted for ITC rather than 1603 Payments could take accelerated depreciation plus bonus depreciation equal to sixty percent (60%) of the cost of the solar array in the year of purchase.

31.

Upon information and belief, starting in tax year 2011 through the present, Griswold Power took full advantage of the accelerated depreciation (2011-2014) and bonus depreciation

(2011-2013) benefits, taking the full amount of the allowed deduction against income for each of the solar arrays purchased from SPE and Sader Power.

### State of Louisiana Tax Credit

#### 32.

In addition to the ITC, Section 1603 payments, and accelerated and bonus depreciation, Griswold Power was eligible for a tax credit established by the State of Louisiana.

#### 33.

The State of Louisiana offers equipment owners a fifty percent (50%) refundable state tax credit, up to $12,500, for solar equipment ("LDR Tax Credit").

#### 34.

Owners may apply for the tax credit when the equipment installation is completed and placed in service.

#### 35.

The Louisiana Department of Revenue ("LDR") sets the guidelines for the tax credit and administers this program.

### The 2011 Agreement Between Griswold and Sader to Pursue Tax Benefits Available for Solar Panel Arrays

#### 36.

Commencing in early 2011, before the formation of Griswold Power, Griswold and Sader discussed, negotiated, and agreed to a business plan and structure wherein Griswold would purchase residential solar equipment from Sader, and Sader would install that equipment (hereinafter "arrays") in and around the New Orleans, Louisiana, area.

37.

Griswold and Sader agreed that Sader and Sader Power would sell solar panel arrays to Griswold, and Sader Power would supply all materials necessary and use such materials to construct and install the arrays for Griswold (hereinafter the "2011 Agreement").

38.

Griswold and Sader further agreed in the 2011 Agreement that Griswold, as owner of the solar panel arrays, would enter into maintenance agreements with each homeowner and charge and collect a monthly maintenance fee from each homeowner.

39.

Griswold and Sader further agreed in the 2011 Agreement that Sader would apply for any and all federal and state tax incentives, credits, and benefits on Griswold's behalf and for Griswold's benefit, including any benefits under Section 1603.

40.

Griswold and Sader further agreed in the 2011 Agreement that throughout the business relationship between Griswold, Sader, and Sader Power, Griswold would provide periodic funding to Sader and Sader Power to support the operating costs of the solar panel array installation business in New Orleans.

41.

Immediately after Griswold and Sader reached this 2011 Agreement, and in reliance on this agreement, Sader and Sader Power began marketing and installing solar panel arrays in and around New Orleans, Louisiana.

42.

Beginning on or around May 5, 2011, in furtherance and recognition of the 2011 Agreement, Griswold began providing periodic funding to Sader and/or Sader Power. Griswold's payments in May 2011 totaled $240,000.

43.

The payments from Griswold to Sader and Sader Power were made from Griswold's personal funds and/or from accounts over which Griswold exercised custody and control.

44.

In furtherance and recognition of the 2011 Agreement, and for the benefit of Griswold, Sader constructed, installed, and invoiced Griswold for 85 solar arrays eligible for Section 1603 and LDR benefits, at a total cost to Griswold of $25,000 per array.

45.

Griswold, Sader, and all of their financial and legal advisors agreed that Griswold would pursue Section 1603 payments under the 5% Safe Harbor rule.

46.

As owner of the solar arrays eligible for payments under Section 1603, Griswold — not Sader or Sader Power — was the party eligible to apply for and receive those payments. Therefore, in furtherance of the 2011 Agreement between Griswold and Sader, Sader applied for the Section 1603 benefits for Griswold under the 5% Safe Harbor rule for the 85 arrays installed in 2011.

47.

Under the supervision and guidance of Sader, and in furtherance and recognition of the 2011 Agreement, Griswold received Section 1603 payments for some or all of the 85 solar arrays designed, provided, and installed by Sader in early 2011.

48.

In furtherance of the 2011 Agreement, and based upon assurances from Griswold that his funding practices would continue, and in preparation to meet their obligations to Griswold, Sader and Sader Power expended significant money, time, and resources, and established a significant and powerful market presence in the New Orleans region.

49.

Contrary to the 2011 Agreement, and contrary to Griswold's earlier course of dealings, and without valid explanation, beginning in or around October 2012, Griswold refused to continue to provide all or a portion of the agreed-upon level of funding. Griswold's wrongful refusals to provide said funding, and the effects of the same, have continued to date.

50.

Griswold failed to fulfill his obligations under the 2011 Agreement, and his actions described herein constitute, among other things, a breach of the agreement.

### The Formation of Griswold Power and the
### Purchased Services Agreement Between Griswold Power and SPE

51.

At the direction of Griswold, Griswold Power was formed in November 2011 as the entity that would own the solar panel arrays installed by Sader's entity, SPE.

52.

Sader was appointed the non-member Manager of Griswold Power. Sader's authority as Manager included executing contracts and documents for the installation and maintenance of solar power equipment on residential property; contacting current and prospective customers for Griswold Power; and applying for state and federal tax incentives, credits, and benefits for the benefit of Griswold and Griswold Power.

53.

Griswold Power and SPE entered into a Purchased Services Agreement ("PSA"), effective November 6, 2011.

54.

The PSA recognizes that SPE "has developed novel and effective methods to install and deliver solar power generating systems to residential customers," and that Griswold Power agreed that it would utilize SPE's system in order to "acquire solar generation systems to be installed on residences."

55.

The PSA provides for an initial term of one year, and after one year may be terminated by either party by providing written notice. Neither party provided the written notice to terminate the PSA.

56.

Griswold Power's "duties" under the PSA included, among other things, "supply[ing] [SPE] with all necessary information and administrative support necessary to fulfill all duties" and to "pay all uncontested invoices as they become due and owing based upon terms agreed to by the parties at the time of invoicing."

57.

SPE has made numerous and repeated demands upon Griswold Power to fulfill its duties under the PSA and to pay the invoices submitted by SPE. In total, SPE has issued invoices to Griswold or Griswold Power for $78,725,000.

58.

Despite Sader's and SPE's numerous and repeated demands, Griswold Power has refused to fulfill its obligations under the PSA, and its actions, described herein, constitute a breach of the PSA.

59.

Eventually, after the formation of Griswold Power, Griswold Power also entered into irrevocable and binding Residential Solar Purchase Agreements[1] ("RSPAs") with SPE and Sader Power, under which Griswold Power agreed to purchase 3,913 solar arrays and pay SPE and Sader Power the purchase price of $25,000 for each array.

60.

RESERVED

61.

RESERVED

62.

RESERVED

**Griswold and Griswold Power's Breach of the Maintenance Agreements
With Solar Customers and Breach of the Maintenance Service Agreement With SPE**

63.

Potential customers seeking to have SPE install a solar array on their homes entered into a maintenance agreement with Griswold Power ("Maintenance Agreement").

64.

Each Maintenance Agreement provides that the customer will pay a $50 monthly maintenance fee to Griswold Power.

---

[1] The RSPAs are at issue in a separate arbitration proceeding filed by Defendant Griswold Power against Jon Sader, Sader Power, and SPE, AAA No. 01-14-0001-7812.

65.

In return, the Maintenance Agreements obligate Griswold Power to, among other things, provide regular monitoring and maintenance services for the solar array equipment during the term of the Maintenance Agreement.

66.

Griswold and Griswold Power entered into an agreement with SPE, wherein it was agreed that SPE would provide the regular monitoring and maintenance services to each customer and collect the amounts due from customers under the Maintenance Agreements (hereinafter "Maintenance Service Agreement").

67.

The Maintenance Service Agreement provided that Griswold and Griswold Power would pay SPE $3.50 per month, per array, for monitoring and physical maintenance of each installed system, and would pay SPE $3.07 per month, per array, for monthly billings and collections from customers on Griswold Power's Maintenance Agreements with customers.

68.

In furtherance of the Maintenance Service Agreement between the parties, SPE expended significant money, time, and resources to hire employees and obtain and purchase the materials necessary to provide the regular monitoring and maintenance services to each customer.

69.

SPE paid for and installed the equipment necessary to monitor the systems, and SPE utilized two vendors, Itron and Powerdash, to provide the monitoring and maintenance services.

70.

Griswold Power and/or Griswold tortiously interfered with the contracts between SPE and Itron and Powerdash by fraudulently inducing the vendors to stop providing their services to SPE. Specifically, upon information and belief, Griswold Power and/or Griswold made material

misrepresentations to Itron and Powerdash about the status of Griswold Power's payments to SPE under the Maintenance Service Agreement. Griswold Power and/or Griswold incorrectly and fraudulently stated to Itron and Powerdash that Griswold and/or Griswold Power had paid SPE in full under the Maintenance Service Agreement and that no amounts were due and owing to SPE under the Maintenance Service Agreement.

71.

In fact, Griswold and Griswold Power failed to compensate SPE as agreed in the Maintenance Service Agreement.

72.

In addition, as SPE prepared to bill and collect amounts due from customers under the Maintenance Agreements, Sader and SPE discovered that Griswold Power had failed to bill or collect these amounts from customers, or bill and collect on a timely basis. Upon information and belief, Griswold Power's failure to collect these amounts has continued to date.

73.

Instead, in breach of the Maintenance Service Agreement, Griswold and Griswold Power withheld the funds designated and intended to pay SPE for maintenance and monitoring and diverted those funds for Griswold and Griswold Power's own use or to other sources.

74.

Griswold and Griswold Power knew their actions and refusal to pay SPE in breach of the Maintenance Service Agreement would cause SPE to default on SPE's agreements and obligations with its employees, suppliers, and subcontractors such as Itron and Powerdash, and subject SPE to significant liability.

75.

SPE has suffered damages and irreparable harm due to its defaults on its agreements and obligations with its suppliers and subcontractors, which directly result from Griswold and Griswold Power's breach of the Maintenance Service Agreement with SPE.

76.

SPE was forced to notify customers it could not continue to provide maintenance and monitoring services, resulting in customer complaints, lawsuits, Better Business Bureau complaints, media investigations and negative reports, and reputational harm.

**The Cooperative Marketing Agreement Between Griswold Power and SPE**

77.

Griswold Power and SPE entered into a Cooperative Marketing Agreement ("CMA"), effective November 15, 2011.

78.

The CMA recognizes that SPE "is in the business of marketing solar electric PV systems to residential customers," and that Griswold Power "is in the business of owning solar electric PV systems, but has no mechanism for marketing."

79.

Under the CMA, SPE agreed to "solicit and arrange contractors to provide marketing for [Griswold Power]," including for television commercials, print advertising, website design and online marketing, and "other advertising necessary to generate business for [Griswold Power]." SPE further agreed to "provide [Griswold Power] with timely accounting," describing these marketing activities.

80.

Griswold Power agreed to "pay all reasonable marketing expenses incurred in the furtherance of the above so long as all activities billed for reasonable further [Griswold Power]'s business interests."

81.

SPE incurred significant amounts in costs and expenses in furtherance of the CMA to provide marketing for Griswold Power, and SPE provided a timely accounting of those activities to Griswold Power.

82.

Griswold Power has failed to pay all reasonable marketing expenses incurred by SPE in furtherance of the CMA.

83.

SPE has made numerous and repeated demands upon Griswold Power to fulfill its duties under the CMA and to pay the invoices submitted by SPE for the reasonable marketing expenses incurred by SPE on behalf of Griswold Power.

84.

Despite SPE's numerous and repeated demands, Griswold Power has refused to fulfill its obligations under the CMA, and its actions, described herein, constitute a breach of the CMA.

## Griswold's Control of Sader and SPE Through
## Withholding Agreed-Upon Payments for Operating Costs

85.

As alleged above, the 2011 Agreement and the PSA obligated Griswold and Griswold Power to provide Sader, Sader Power, and SPE with sufficient operating funds on a regular basis.

86.

Sader, Sader Power, and SPE relied upon these assurances by Griswold and Griswold Power, and these operating funds were necessary for continued day-to-day operations in Louisiana and to ensure successful installation of solar arrays.

87.

Sader, Sader Power, and/or SPE incurred significant amounts in operating costs and expenses in furtherance of the 2011 Agreement, the PSA, the CMA, and the Maintenance Service Agreement with Griswold and Griswold Power, including:

A)   Cost of employee and workforce salaries, wages, benefits, and training;

B)   Cost of solar equipment and technology necessary to install solar arrays for Griswold Power;

C)   Marketing and advertising expenses to obtain residential customers for the solar arrays, including but not limited to the cost of salary and benefits for marketing and sales employees; television and print marketing; internet marketing; and billboards;

D)   Cost of lease payments on a large office building and warehouse, necessary to construct and store components of the solar arrays;

E)   Cost of applying for Section 1603 and other tax benefits for Griswold Power;

F)   Cost of necessary computer equipment and software, including software necessary for cost tracking and accounting systems; and

G)   Fees and costs for attorneys, accountants, lobbyists, and consultants retained by both SPE and Griswold Power to determine proper process to obtain all available benefits for the solar arrays.

88.

Despite their promises and assurances to the contrary, Griswold and Griswold Power intentionally underfunded SPE's operating funds by failing to pay amounts requested by and contractually due to SPE.

89.

Griswold Power's intentional acts to keep SPE underfunded on operating funds were carried out at the instruction of Griswold. Griswold's actions also constitute intentional interference by Griswold with Griswold Power's agreements and contracts with Sader, Sader Power, and SPE.

90.

By December 2013, Griswold and Griswold Power ceased all payments to SPE. This action forced SPE to terminate all operations because SPE could not pay operating costs, including employee salaries and wages, and payment to subcontractors and equipment suppliers.

91.

Griswold and Griswold Power's actions intended to inflict harm upon SPE for Griswold and Griswold Power's own gain and competitive advantage. By withholding payments, Griswold intended to eliminate Sader, Sader Power, and SPE as competitors; appropriate their market share; and retain all revenues from the solar panel installation business.

### Griswold's Manipulation and Control of Griswold Power, and Intentional Interference With Griswold Power's Agreements and Contracts

92.

At all relevant times, Griswold manipulated and controlled Griswold Power for his own purposes and personal gain, which eventually resulted in Griswold Power's breach of the 2011 Agreement, the PSA, the CMA, the RSPAs, the Maintenance Service Agreement, and other agreements between Griswold, Griswold Power, Sader, Sader Power, and/or SPE.

93.

Upon information and belief, Griswold manipulated the day-to-day operations of Griswold Power, including instructing the bookkeepers as to which routine bills and expenses of Sader Power and SPE to pay and when to pay them.

94.

Griswold retained the sole and full authority to hire and dismiss employees of Griswold Power, a power he exercised with regularity, to the harm of Griswold Power.

95.

Griswold also directed the strategic planning of Griswold Power by developing and executing the company's general business model, developing and executing the company's marketing efforts, and monitoring the company's revenue and expenses. Additionally, Griswold regularly presented himself to third parties as a representative of Griswold Power by appropriating that title and executing instruments for Griswold Power as its "Authorized Representative."

96.

Griswold personally negotiated the terms of Griswold Power's contracts and agreements with Sader, Sader Power, and SPE, and was involved directly in structuring the transactions between Griswold Power and SPE, and between SPE and its suppliers.

97.

Griswold also had full knowledge of Griswold Power's obligations under the agreements and contracts with Sader and SPE, including but not limited to the obligation to pay Sader Power and SPE the agreed-upon price for each solar array.

98.

At some point during the relationship between SPE and Griswold Power, Griswold made the unilateral and unjustified decision that Griswold Power would no longer pay Sader, Sader Power, and/or SPE the agreed-upon price for each solar array. Thereafter, Griswold alone directed Griswold Power to withhold payment of the sums remaining due to Sader, Sader Power, and/or SPE, in breach of the agreements and contracts with Sader, Sader Power, and/or SPE, including

but not limited to the 2011 Agreement, the PSA, the CMA, the RSPAs, and the Maintenance Service Agreement.

99.

As alleged, Griswold, acting as the sole manager of Griswold Power, caused Griswold Power to breach its contracts with Sader, Sader Power, and SPE, to wit: Griswold intentionally interfered with Griswold Power's contracts and agreements with Sader, Sader Power, and SPE, including but not limited to the 2011 Agreement, the PSA, the CMA, the RSPAs, and the Maintenance Service Agreement, for his own personal gain.

100.

Moreover, on or about December 12, 2013, Griswold, without justification, removed Sader as Manager of Griswold Power, and Griswold then assumed the position of Manager of Griswold Power.

101.

Griswold's unjustified and arbitrary removal of Sader as Manager gave Griswold his desired complete control over Griswold Power, including control over every aspect and detail of Griswold Power's day-to-day operations, finances, employees, and relationship with SPE and Sader.

102.

After Griswold took complete control of Griswold Power, he intentionally manipulated and directed every action of Griswold Power in order to breach Griswold Power's agreements and contracts with SPE, eventually forcing SPE into complete collapse.

103.

Before Sader was removed as non-member Manager of Griswold Power, SPE completed installation of 2,445 solar arrays for Griswold and Griswold Power. Griswold Power and SPE had

irrevocable and binding contracts in place for SPE to install and Griswold Power to purchase an additional 1,468 solar arrays.

104.

Griswold knew that Griswold Power's agreements with SPE were irrevocable.

105.

Despite this knowledge, Griswold alone directed Griswold Power not to pay SPE in full for both the installed and uninstalled solar arrays.

106.

Griswold and Griswold Power's actions intended to inflict harm upon Sader, Sader Power, and SPE for Griswold and Griswold Power's own gain and competitive advantage.

107.

Upon information and belief, before entering into business relationships and contracts with Sader and SPE, Griswold and Griswold Power had little to no presence or market share in the New Orleans or Gulf South regions. Griswold Power and Griswold relied solely upon SPE's overwhelming market share, competitive advantage, and significant presence in the New Orleans region to succeed in Griswold's business plan to profit from the various incentives for solar power. Griswold's scheme was manifold: (1) take over Griswold Power as its sole Manager; (2) as Manager, withhold all payments that were due and owing to Sader, Sader Power, and SPE; and (3) use Griswold Power to appropriate Sader Power and SPE's market share and eliminate them as competitors.

### Griswold and Griswold Power's Actions Caused SPE to Default on Obligations to Suppliers and Subcontractors

108.

Griswold and Griswold Power's breaches of their contracts and agreements and failures to pay caused Sader, Sader Power, and SPE to default on their obligations to many of their subcontractors and equipment suppliers.

109.

Sader, Sader Power, and SPE invested significant money, time, and resources in order to perform under their agreements and contracts with Griswold and Griswold Power, and to purchase and obtain the materials necessary to construct and install the solar arrays.

110.

When Griswold and Griswold Power ordered SPE to stop the installation of the solar arrays and stopped payment for those solar arrays, Griswold and Griswold Power knew that Sader, Sader Power, and/or SPE had already purchased and obtained all or a significant amount of the materials necessary to construct and install the solar arrays.

111.

When Griswold and Griswold Power ordered SPE to stop the installation of the solar arrays and stopped payment for those solar arrays, Griswold and Griswold Power knew their actions and refusal to pay for the solar arrays Griswold Power agreed to purchase would cause Sader, Sader Power, and/or SPE to default on their agreements and obligations with their suppliers and subcontractors, and subject them to significant liability. Upon information and belief, Griswold and Griswold Power intended for Sader, Sader Power, and/or SPE to default on these agreements and obligations with their suppliers and subcontractors, subjecting them to significant liability.

112.

Sader, Sader Power, and SPE have in fact suffered damages and irreparable harm from their defaults on agreements and obligations with their suppliers and subcontractors, which were caused solely by Griswold and Griswold Power's refusal to pay and fulfill their obligations under their agreements and contracts, including the 2011 Agreement, the PSA, the CMA, the RSPAs, and the Maintenance Service Agreement. But for Griswold and Griswold Power's intentional refusal to pay, Sader, Sader Power, and SPE would have honored their obligations to their subcontractors and equipment suppliers.

113.

Sader, Sader Power, and SPE have incurred significant costs and expenses because of suits and demands from their suppliers and subcontractors, including significant attorneys' fees.

## Griswold and Griswold Power's Actions
## Resulted in Lawsuits and Complaints by Solar Customers

114.

RESERVED

115.

RESERVED

116.

RESERVED

117.

RESERVED

118.

RESERVED

119.

RESERVED

## Griswold and Griswold Power's Actions Rendered Sader and SPE Unable to Pay Employee Wages, Salaries, and Benefits

120.

SPE, in furtherance of its agreements and contracts with Griswold and Griswold Power, expended significant money, time, and resources to hire employees to construct and install the solar arrays that Griswold Power had agreed to purchase.

121.

To fulfill its obligations under its agreements and contracts with Griswold and Griswold Power, SPE hired and trained administrative employees and hired and trained a construction workforce in the specialized work of constructing and installing solar arrays.

122.

SPE incurred significant costs in salaries, wages, and benefits for SPE's installation workforce, and significant expenses in training its workforce employed for purposes of installation and construction of the solar arrays, including but not limited to expenses incurred in the training of employees to obtain proper certification to construct and install the residential arrays; proper administration of employee safety programs; proper training of employees on array monitoring systems; the creation and publication of employee handbooks outlining work regulations and procedures; and training of employees for maintenance of the solar arrays as installed on customers' homes.

123.

When Griswold and Griswold Power ordered SPE to stop installations of the solar arrays and stopped payment to SPE, they knew that SPE had hired many employees, acquired specialized equipment and software, and leased larger facilities solely to fulfill its obligations to Griswold and Griswold Power. In fact, many of SPE's employees were hired solely at the direction of Griswold and Griswold Power, and acquisition of much of the specialized equipment and software and the lease of larger facilities were done solely at the direction of Griswold and Griswold Power.

124.

Griswold and Griswold Power also knew their failure to pay for the solar arrays they purchased would render SPE unable to pay its employees' salaries and benefits.

125.

Because of Griswold and Griswold Power's breaches and failure to pay SPE, SPE could not pay its employees' salaries and benefits, resulting in many resignations by employees, and requiring SPE to undertake significant reductions in its workforce.

126.

Losing its employees and workforce due to Griswold and Griswold Power's actions rendered SPE unable to construct and install solar arrays.

127.

Griswold and Griswold Power's failure and refusal to pay SPE for employees' salaries and benefits were an intentional act for Griswold and Griswold Power's own gain and competitive advantage.

## Griswold and Griswold Power's Employee Poaching

128.

In an effort to inflict harm upon SPE for Griswold and Griswold Power's own gain and competitive advantage, Griswold and Griswold Power coerced and hired away many of SPE's most valuable employees, knowing those employees were critical to SPE's ability to install and construct solar arrays.

129.

Many of these employees were hired away from SPE when SPE could no longer pay their salaries or wages as a result of Griswold and Griswold Power's breaches of their agreements with SPE and failure to pay SPE.

130.

For example, SPE employed Avion Turner as a bookkeeper who was primarily responsible for data entry of bills, processing of salary checks, and processing of payments to vendors. Gris Griswold Power and Griswold approached Avion Turner and coerced him to leave his employment at SPE to accept a similar position for Griswold Power.

131.

Eileen Kelly was the Comptroller hired for SPE, and was responsible for accounting department supervision, billing of monthly maintenance fees, implementation of accounting software, and collections of monthly payments. Griswold Power and Griswold approached Eileen Kelly and coerced her to leave her employment at SPE to accept a similar position for Griswold Power.

132.

Griswold and Griswold Power hired Avion Turner and Eileen Kelly not to improve their own operations or accounting functions, but solely to harm the operations and accounting capacity of SPE.

133.

In addition, Griswold Power hired Russell Moran, who was SPE's Coordinator of General Contractors; Nathan Barthels, SPE's Solar Panel Array Installer; and Michael Devhun, SPE's Shade Study Expert, to harm the operations and accounting capacity of SPE, to interfere with SPE's capability to fulfill its obligations to Griswold and Griswold Power, and for Griswold Power's own gain and competitive advantage.

134.

Griswold and Griswold Power engaged in similar employee-poaching practices between January 2013 and March 2014. In all instances, Griswold and Griswold Power's purpose was to inflict harm upon SPE for Griswold and Griswold Power's own gain and competitive advantage.

135.

Upon information and belief, Griswold and Griswold Power engaged in these employee-poaching practices in order to gain access to Sader Power, SPE, and Sader's proprietary and/or confidential information or trade secrets.

136.

Upon information and belief, Griswold and Griswold Power engaged in these employee-poaching practices in order to appropriate Sader, Sader Power, and SPE's market share and eliminate them as competitors.

### Griswold Converts Funds Intended for SPE for His Own Personal Use

137.

On or about December 26, 2012, Griswold Power executed a loan agreement with the lender Centaurus Capital LP ("Centaurus").

138.

The agreement between Griswold Power and Centaurus provided that funding from Centaurus was to be used exclusively for the acquisition by Griswold Power of the solar arrays installed by SPE, which were eligible for federal and state tax incentives.

139.

A portion of the funding was also designated exclusively to be used to pay SunWize Technologies Inc. ("SunWize"), SPE's supplier of solar equipment, for modules and inverters for solar arrays purchased from SunWize and installed by SPE before the closing of the Centaurus loan agreement.

140.

Griswold, intentionally and without justification, diverted the Centaurus loan funds designated and intended to pay SPE for solar arrays for his own personal use in addition to making diversions of said loan proceeds to other affiliates and advisors of Griswold Power for their own personal use.

141.

In addition, Griswold instructed Sader and SPE and its employees not to inform Centaurus of his diversion of funds.

142.

Upon information and belief, Griswold diverted from the Centaurus loan funds a total of $3,613,851 for his own personal use, and has retained those funds to date.

**Griswold Continues to Enjoy the Benefits of Solar Array Incentive Programs**

143.

RESERVED

144.

RESERVED

145.

RESERVED

146.

RESERVED

147.

RESERVED

148.

RESERVED

149.

RESERVED

150.

RESERVED

**Parents and Affiliates of Griswold Power or Other Entities Controlled
by Griswold Constitute a Single Business Enterprise With Griswold Power**

151.

The group of entities affiliated with Griswold Power or controlled by Griswold constitutes a single business enterprise such that the purported corporate separateness between those entities must be disregarded, and the liability of Griswold Power must be extended to each of the affiliated entities.

152.

The liability of the affiliated entities arises from Griswold and Griswold Power's wrongful acts as alleged herein, including but not limited to Griswold's intentional and systematic use of the affiliated entities to defraud their creditors and obligees (including Sader Power, SPE, and Sader), and to shield Griswold from liability from his actions.

153.

Moreover, application of the single business enterprise doctrine is necessary in this case to achieve equity, including but not limited to making Sader, Sader Power, and SPE whole from Griswold and Griswold Power's wrongful acts as alleged herein.

154.

These entities have an identity or substantial identity of ownership, giving Griswold actual working control of each entity. These entities include but are not limited to the following: Cyber Access Control, LLC; DEG Ventures, LLC; DEG Energy, LLC; DEG Fusion, Inc.; DEG Properties, LLC; DM Properties, LLC; Griswold Controls; Griswold Controls International, Inc.; Griswold Industries (d/b/a Cla-Val Co.); Griswold Land Holding Co., Ltd.; Metapower, LLC; N. H., LLC; National Certified Fabricators, Inc.; Ultrasonic Systems, LLC; Alternative Power Generation, LLC; Alternative Energy Institute, Inc.; Electronic Precipitation Systems, LLC (d/b/a Griswold Water Systems); Flowcon Americas, LLC; Flowcon International; Pace Envirowater Group, Inc.;

Water Efficient Technology System Services LLC; Scientific Being Research Foundation, Inc.; For Our Country – United States; and For Our Country – United States IV.

155.

Many of these entities have common directors or officers; for example, Griswold is the sole officer of DEG Fusion, Inc., and is an officer of Griswold Controls; Griswold Controls International, Inc.; Flowcon Americas, LLC; and Flowcon International. Griswold is the sole director of DEG Fusion, Inc.; Griswold Controls International, Inc.; and National Certified Fabricators, Inc., and is a director of Alternative Energy Institute, Inc., and Griswold Controls.

156.

Some of the initial funding agreed to by Griswold in the 2011 Agreement with Sader was paid directly to Sader and/or Sader Power by DEG Ventures, LLC.

157.

Moreover, many of these entities are under the sole control or ownership of Griswold: David Griswold is the sole manager, or an entity controlled exclusively by Griswold is the sole manager, of Alternative Energy Institute, Inc.; Alternative Power Generation, LLC; DEG Energy, LLC; DEG Properties, LLC; DEG Ventures, LLC; Flowcon Americas, LLC; Metapower, LLC; Ultrasonic Systems, LLC; and Scientific Being Research Foundation, Inc., and Griswold is a manager of NH, LLC. David Griswold is the sole member, or an entity controlled exclusively by Griswold is the sole member, of Alternative Energy Institute, Inc.; Alternative Power Generation, LLC; DEG Energy, LLC; DEG Properties, LLC; DEG Ventures, LLC; DM Properties, LLC (ninety-nine percent [99%] membership); Electronic Precipitation Systems, LLC; Flowcon Americas, LLC; Metapower, LLC; National Certified Fabricators, Inc.; and Ultrasonic Systems, LLC, and Griswold is a member of NH, LLC.

158.

Many of these entities have common business offices at 2801 or 2803 Barranca Parkway, Irvine, California: Alternative Energy Institute, Inc.; Alternative Power Generation, LLC; Cyber Access Control, LLC; DEG Energy, LLC; DEG Fusion, Inc.; DEG Properties, LLC; DEG Ventures, LLC; Flowcon Americas, LLC; Griswold Controls; Griswold Controls International, Inc.; Metapower, LLC; NH, LLC; Ultrasonic Systems, LLC; Scientific Being Research Foundation, Inc.; For Our Country – United States; and For Our Country – United States IV.

159.

Upon information and belief, there is unified administrative control of these entities, whose business functions are similar or supplementary. They share many employees, and services are rendered by the employees of one entity for another entity. These entities own, control, or administer Griswold's interests in many alternative energy investments, and the same employees administer the day-to-day business operations of those same entities.

160.

As was the case with Griswold Power, where the debts or financial obligations of Griswold Power to SPE and Sader were actually paid by Griswold personally or another Griswold entity (such as DEG Ventures, LLC), many of these entities are financed by the other entities controlled by Griswold and pay the salaries and other expenses or losses of the other entities.

161.

As alleged herein in regard to Griswold Power, these entities are inadequately capitalized in an effort to avoid creditors and obligees.

162.

These entities utilize centralized accounting, using the same employees, accounting system and software, and accounting consultants, including the personal accountants of Griswold. For example, the Chief Financial Officer of National Certified Fabricators, Inc., is responsible for the

accounting of all entities forming the single business enterprise with Griswold Power. Further, one or more of the accountants employed by Electronic Precipitation Systems, LLC (d/b/a Griswold Water Systems), were responsible for the accounting for other entities forming the single business enterprise with Griswold Power, including Griswold Controls.

163.

In addition, and upon information and belief, these entities receive no business other than that given to them by the affiliated entities; these entities use the property of the affiliated entities as their own; the entities do not comply with corporate formalities; the entities engage in undocumented transfers of funds between affiliated corporations; the allocation of profits and losses between corporations is unclear; and there is excessive fragmentation of a single enterprise into separate corporations.

164.

For example, upon information and belief, Griswold removed approximately $10,000,000 from Griswold Industries (d/b/a Cla-Val Co.) to cover the expenses of Griswold Power. However, Griswold never advanced the money to Griswold Power, and retained the funds for his own personal use.

## COUNT ONE:
## BREACH OF CONTRACT

165.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 164.

166.

Griswold and Griswold Power's actions described herein, which have continued to date, including but not limited to Griswold Power's failure to provide periodic funding of operating costs to Sader and SPE, constitute a failure to perform and breach of the agreements between

Griswold, Griswold Power, Sader, Sader Power, and/or SPE, including but not limited to the 2011 Agreement, the PSA, the CMA, and the Maintenance Service Agreement.

167.

Griswold and Griswold Power's failure to perform and their breaches have resulted in damages to Sader, SPE, and/or Sader Power. Griswold and Griswold Power are liable to Sader, Sader Power, and SPE for damages, in an amount to be determined at trial of this matter, resulting from their breaches of contract.

168.

Griswold and Griswold Power's actions described herein, which have continued to date, were in bad faith. Griswold and Griswold Power intentionally and maliciously failed to perform their obligations under the 2011 Agreement, the PSA, the CMA, and the Maintenance Service Agreement, and therefore are obligors in bad faith pursuant to La. Code Civ. Proc. art. 1997. Griswold and Griswold Power's acts of bad faith include but are not limited to those as alleged herein.

169.

Damages include but are not limited to loss sustained by Sader, Sader Power, and SPE and the profit of which they have been deprived; interest on the amount due from the time it was due for damages for delay in performance; and all damages that are a direct consequence of Griswold and Griswold Power's failure to perform.

## COUNT TWO:
## TORTIOUS INTERFERENCE WITH A CONTRACT

170.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 169.

171.

Griswold's actions described herein, which have continued to date, constitute intentional and tortious interference with the agreements by and between Sader, Sader Power, SPE, Griswold, and Griswold Power, including but not limited to the 2011 Agreement, the PSA, the CMA, the RSPAs, and the Maintenance Service Agreement.

172.

As alleged above, Griswold knew about these agreements and contracts.

173.

Griswold, as a member, manager, and/or principal of Griswold Power, intentionally induced and/or caused Griswold Power to breach its agreements and contracts with Sader, Sader Power, and/or SPE, and/or intentionally made rendition of the agreements' and contracts' performance impossible or more burdensome. For instance, Griswold directed the withholding of payments due under these agreements and knew that Griswold Power's withholdings would cause a breach of these agreements with Griswold Power. Upon information and belief, Griswold instructed Griswold Power's representatives and counsel that Griswold Power was to breach its agreements with SPE, Sader Power, and/or Sader.

174.

There is no justification for Griswold's actions, including his instruction to breach Griswold Power's contracts with Sader, Sader Power, and/or SPE.

175.

SPE, Sader Power, and Sader's damages were caused by the breaches and/or difficulty of contract performance brought about by Griswold.

176.

Griswold's actions have resulted in damages to SPE, Sader Power, and/or Sader, and Griswold is liable to them for damages, in an amount to be determined at trial of this matter,

resulting from Griswold's intentional interference with Griswold Power's agreements with SPE, Sader Power, and/or Sader.

## COUNT THREE:
## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

### 177.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 176.

### 178.

Griswold's actions described herein, which have continued to date, constitute a tortious interference with the business relationship between Sader, Sader Power, and SPE on the one hand and Griswold Power on the other.

### 179.

Griswold took complete control of Griswold Power and forced Griswold Power to terminate its business relationship with Sader, Sader Power, and SPE. He exercised his complete control over every aspect of Griswold Power to improperly compel the company to terminate all contact and relationships with Sader, Sader Power, and SPE. This vast influence and control manifested itself in the breach of the contracts and agreements between Griswold Power and Sader, Sader Power, and/or SPE, and culminated in forcing the failure of the business relationship between the parties, formed to install solar arrays eligible for federal and state tax credit programs.

### 180.

Griswold Power's breach of the agreements and contracts with Sader, Sader Power, and/or SPE resulted directly from the arbitrary, improper, unjustified, and malicious influence of Griswold.

181.

After Griswold interfered with the profitable business relationship and exercised his vast influence and control, payments to SPE ceased; the relationship between Griswold Power and Sader, Sader Power, and SPE was terminated; and Griswold Power breached the agreements and contracts, including the PSA, the CMA, the RSPAs, and the Maintenance Service Agreement.

182.

Sader, Sader Power, and SPE have suffered pecuniary losses and damages because of Griswold's malicious and wanton interference with their business relationship with Griswold Power. Griswold is liable to Sader, Sader Power, and SPE for damages, in an amount to be determined at trial of this matter, resulting from Griswold's intentional interference with Griswold Power's business relationship with Sader, Sader Power, and SPE.

## COUNT FOUR:
## LOUISIANA UNFAIR TRADE PRACTICES ACT

183.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 182.

184.

As alleged above, Griswold and Griswold Power engaged in a variety of unfair or deceptive trade practices, which have continued to date, and caused significant harm to and pecuniary damages for Sader, Sader Power, and SPE.

185.

Griswold engaged in these deceptive acts or practices solely to harm the operations of Sader, Sader Power, and SPE.

186.

Upon information and belief, Griswold and Griswold Power engaged in these unfair methods of competition and deceptive acts or practices in order to prevent or otherwise frustrate Sader, Sader Power, and SPE's ability to conduct business and meet their operating obligations, including the obligation to build solar arrays for Griswold Power and to monitor the production of installed solar arrays.

187.

Griswold and Griswold Power's goal and intent was to create an anticompetitive environment in which Sader, Sader Power, and SPE could not continue operations and would be left with little choice but to cease operations or permit Griswold and Griswold Power to assume their obligations without compensation.

188.

Griswold and Griswold Power's egregious acts include but are not limited to targeting and appropriating solar customers who would not have been obtained without the skill and expertise of Sader, Sader Power, and SPE; misrepresenting to Sader, Sader Power, and SPE the liquidity and capital of Griswold Power and its ability to provide funding to Sader, Sader Power, and SPE; deceiving Sader, Sader Power, and SPE as to Griswold Power's ability to pay and then underpaying and underfunding SPE; and coercing SPE's employees to leave SPE — to Sader, Sader Power, and SPE's detriment — effectuating a shutting down of SPE's sales force.

189.

Griswold and Griswold Power's actions were egregious and deceptive in nature and resulted in pecuniary losses for SPE. Griswold and Griswold Power are liable to Sader, Sader Power, and SPE for damages, in an amount to be determined at trial of this matter, resulting from their unfair and anticompetitive trade practices.

## COUNT FIVE: FRAUD

190.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 189.

191.

In the 2011 Agreement, the PSA, the CMA, and the RSPAs, Griswold and/or Griswold Power misrepresented to Sader, Sader Power, and/or SPE that Griswold and/or Griswold Power was suitably capitalized and would provide all operating funds and payments on invoices to Sader, Sader Power, and/or SPE.

192.

Sader, Sader Power, and/or SPE relied on these representations by Griswold and/or Griswold Power in entering into the numerous contracts with Griswold and/or Griswold Power, including but not limited to the 2011 Agreement, the PSA, the CMA, and the RSPAs.

193.

At the time all such representations were made by Griswold and/or Griswold Power, however, the representations were fraudulent because Griswold and/or Griswold Power knew that such operating funds and payments on invoices would not or could not be made.

194.

Rather, the representations were made to induce Sader, Sader Power, and/or SPE to enter into the numerous contracts with Griswold and/or Griswold Power with the intent to force Sader, Sader Power, and/or SPE out of the solar power market, so as to advantage Griswold and Griswold Power in the solar power market.

195.

This fraud carried out by Griswold and Griswold Power has resulted in an unjust advantage to Griswold and Griswold Power and pecuniary losses for Sader, Sader Power, and

SPE. Griswold and Griswold Power are liable to Sader, Sader Power, and SPE for damages, in an amount to be determined at trial of this matter, resulting from their fraudulent acts.

## COUNT SIX: NEGLIGENT MISREPRESENTATION

196.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 195.

197.

Alternatively, if Griswold and Griswold Power's acts were not fraudulent, Griswold and Griswold Power are liable for the negligent misrepresentations as alleged herein.

198.

Griswold and Griswold Power had the duty and obligation to make full and accurate disclosures to Sader, Sader Power, and/or SPE, but failed to do so.

199.

Griswold and Griswold Power's misrepresentations and omissions were false and misleading at the time they were made, and were made negligently and without the exercise of due care.

200.

Sader, Sader Power, and/or SPE reasonably relied on and were induced by these misrepresentations and omissions by Griswold and/or Griswold Power as alleged herein, with that reliance resulting in substantial and foreseeable damages to Sader, Sader Power, and/or SPE.

201.

Griswold and Griswold Power's negligent misrepresentations have resulted in an unjust advantage to Griswold and Griswold Power and pecuniary losses for Sader, Sader Power, and SPE. Griswold and Griswold Power are liable to Sader, Sader Power, and SPE for damages, in an amount to be determined at trial of this matter, resulting from their negligent misrepresentations.

## COUNT SEVEN: CONVERSION

202.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 201.

203.

As alleged herein, Griswold, intentionally and without justification, converted the Centaurus loan funds designated and intended to pay SPE for solar arrays for his own personal use, in addition to making diversions of said loan proceeds to other members and owners of Griswold Power for their own personal use, or for the benefit of the other entities owned or controlled by Griswold.

204.

Griswold's conversion of funds has resulted in damages to Sader, Sader Power, and SPE. Griswold is liable to Sader, Sader Power, and SPE for damages, in an amount to be determined at trial of this matter, resulting from his acts of conversion.

## COUNT EIGHT (IN THE ALTERNATIVE): UNJUST ENRICHMENT

205.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 204.

206.

By reason of the acts as alleged herein, Griswold and Griswold Power have been unjustly enriched and Sader, Sader Power, and SPE have been impoverished without cause, resulting in damages to Sader, Sader Power, and SPE.

207.

Griswold and Griswold Power are liable to Sader, Sader Power, and SPE for damages, in an amount to be determined at trial of this matter, resulting from this unjust enrichment.

## COUNT NINE: INDEMNITY

### 208.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 207.

### 209.

To date, SPE, Sader Power, and/or Sader have been named as defendants in the recently filed litigation and arbitration described below and identified by caption.

A) *Griswold Power, LLC v. Jon Sader, Sader Power, LLC & Sader Power Enterprises, LLC,* Case No. 01 14 0001 7812 before the American Arbitration Association.

B) *Torregano v. Sader Power, Sader Power Enterprises, & Griswold Power, LLC*, No. 14-293 in the United States District Court, Eastern District of Louisiana. The case alleges defendants inflated the potential savings to solar customers.

C) *Ameresco Solar LLC v. Jon Sader & Sader Power Enterprises, LLC*, No. 14-2890 in the United States District Court, Eastern District of Louisiana. The case alleges amounts owed by defendants on open account.

D) *Grant Resource Advisors, LLC v. Sader Power, LLC & Sader Power Enterprises, LLC*, No. 2012-00819 in the Civil District Court for the Parish of Orleans, State of Louisiana, and American Arbitration Association No. 6919821611. Allegations are based on claims of breach of a joint-venture agreement between the parties, in part due to the relationship between Griswold Power and Sader Power Enterprises.

E) Jefferson Parish sales/use tax audit of Sader Power Enterprises, LLC, for the period January 1, 2010 - March 31, 2013.

F) *234 Harbor Circle LLC v. Sader Power & W. Lawton*, No. 2013-10365 in the Civil District Court for the Parish of Orleans, State of Louisiana. Allegations based upon lease/purchase agreement of immovable property at 234 Harbor Circle.

G) *Shockey & Assoc. v. Jon Sader & Sader Power Enterprises, LLC*, No. 634,223 in the 19th Judicial District Court for the Parish of

East Baton Rouge, State of Louisiana. Alleging unpaid legal fees of $7,261.14.

H) *Susan and Dean Hinton v. Dupuy Storage Power & Forwarding & Sader Power Enterprises LLC*, No. 13-9917, Division L, Civil District Court for the Parish of Orleans, State of Louisiana. Allegations are based on tortious interference with contract, business relations, and economic advantage.

210.

To date, Jon Sader has incurred $329,981.26 in attorneys' fees and costs for the investigation and defense of these matters, not including fees incurred in *Griswold Power, LLC v. Jon Sader, Sader Power, LLC & Sader Power Enterprises, LLC*, Case No. 01 14 0001 7812 before the American Arbitration Association. To date, the costs in the AAA arbitration total $16,978.30.

211.

The $329,981.26 in attorneys' fees and costs for the investigation and defense of these matters is broken down as follows:

| | |
|---|---:|
| James White | $62,682.28 |
| Baker Donaldson | $214,895.05 |
| Barkley & Thompson | $25,855.63 |
| Guarisco, Cordes & Lala, LLC | $3,525.00 |
| American Arbitration Association | $16,978.30 |
| Brett S. Lala | $6,045.00 |
| | **$329,981.26** |

212.

The Limited Liability Company Agreement of Griswold Power, dated November 30, 2011 (the "Operating Agreement"), provides, in pertinent part:

11.1   <u>General.</u> Except as otherwise specifically set forth in this Agreement, the Company, its receiver or its trustee, shall indemnify, defend and save harmless the Manager and Members ("Indemnitees") from any liability, loss or damage incurred by any Indemnitee by reason of any act performed or omitted to be performed by any Indemnitee in connection with the business of the

Company, including costs and attorneys' fees and any amounts expended in the settlements of any claims of liability, loss or damage; provided that if the liability, loss or claim arises out of any action or inaction of an Indemnitee: (a) such Indemnitee must have determined, in good faith, that his or her course of conduct was not opposed to the best interests of the Company; and (b) the action or inaction did not constitute fraud, breach of fiduciary duty, gross negligence or willful malfeasance by such Indemnitee; and, provided further, that the indemnification shall be recoverable only from the assets of the Company and not any assets of the Members. The Company may, however, purchase and pay for that insurance, including extended coverage liability and casualty and worker's compensation, as would be customary for any person engaging in a similar business, and name the Indemnitees as additional or primary insured parties.

11.2   <u>Advancement of Expenses</u>. The Company shall advance all expenses incurred by an Indemnitee in connection with the investigation, defense, settlement or appeal of any civil or criminal action or proceeding referenced in Section 12.1 hereof. The Indemnitee shall repay such amounts advanced only if, and to the extent that, it shall ultimately be determined that such Indemnitee is not entitled to be indemnified by the Company as authorized hereby. The advances to be made hereunder shall be paid by the Company to the Indemnitee within ten (10) days following delivery of a written request therefore by the Indemnitee to the Company.

213.

The Operating Agreement obligates Griswold Power to indemnify, defend, and hold Sader harmless for any liability, loss, or damage incurred by Sader by reason of any act performed or omitted to be performed by him for the business of Griswold Power, including costs and attorneys' fees and any amounts expended in the settlements of any claims of liability, loss, or damage.

214.

On June 11, 2015, undersigned counsel sent a "Demand for Contractual Indemnification" letter to Griswold Power, LLC, Eileen Kelly, Manager, c/o Eric J. Simonson, Anthony Rollo, and Adam C. McNeil, McGlinchey Stafford, PLLC, 601 Poydras Street, 12th Floor, New Orleans, LA

70130, via email and Certified Mail, Return Receipt Requested No. 7013 2630 0001 2459 4999. Said Demand for Contractual Indemnification was delivered and signed for on Monday, June 15, 2015, at 9:07 a.m.

215.

This Demand for Contractual Indemnification was carbon copied to Harry Yates, Trustee of the David E. Griswold Special Asset Trust, 18298 S. Springwater Road, Estacada, OR 97023, via Certified Mail, Return Receipt Requested No. 7013 2630 0001 2459 4982. Said Demand for Contractual Indemnification was delivered and signed for on Monday, June 15, 2015, at 11:25 a.m.

216.

Griswold Power has failed to indemnify, defend, and hold Sader harmless as agreed in the operating agreement. Sader will continue to sustain liability, loss, or damage, and seeks to recover the amounts or liability incurred, and all costs and attorneys' fees, in an amount to be determined at trial of this matter.

**COUNT TEN:**
**DAVID GRISWOLD IS LIABLE FOR THE DEBTS OF GRISWOLD POWER**

217.

Plaintiffs reiterate and adopt by reference the allegations outlined in paragraphs 1 – 216.

218.

At all times, Griswold Power has been the alter ego of David Griswold, such that Griswold must be held personally liable for the debts and obligations of his company, Griswold Power. Moreover, the general rule of limited liability of La. Rev. Stat. § 12:1320 does not apply to Griswold, and because of his actions as alleged herein, Griswold is not entitled to the protections of that statute.

219.

Griswold's personal liability for Griswold Power's debts and obligations arises from, among other things, his intentional and systematic undercapitalization of Griswold Power.

220.

Griswold Power undertook an irrevocable, unconditional obligation to pay Sader, Sader Power, or SPE over $95,000,000 for the installation of solar arrays and represented as much to federal and state authorities. But from the beginning of the relationship between the parties, Griswold Power lacked the funds, capitalization, or financial ability necessary to honor those contracts, and Griswold Power and Griswold contracted with Sader, Sader Power, and SPE knowing that Griswold Power did not have the requisite funds or even financial condition to ever pay the amounts due or meet the obligations of the contracts with Sader, Sader Power, and/or SPE.

221.

Because it lacked the funds, capitalization, or financial ability to meet its irrevocable, unconditional contractual obligations to SPE and Sader Power, Griswold Power was severely undercapitalized. Griswold Power's undercapitalization prevented its creditors from enforcing their contracts and collecting or recovering the amounts Griswold Power owed.

222.

Griswold Power's undercapitalization was intentional. Griswold intentionally undercapitalized Griswold Power by withholding capital and payments for operating costs, converting funds intended for SPE for his own personal use, and other acts and omissions as alleged herein.

223.

Upon information and belief, Griswold intentionally undercapitalized Griswold Power, LLC, in order: (1) to prevent or frustrate its creditors, including Sader, Sader Power, and SPE,

from enforcing the company's obligations to pay through the judicial process or otherwise; and (2) to use this as leverage against his creditors, including Sader, Sader Power, and SPE, if and when they sought to enforce the company's obligations to pay through the judicial process.

224.

Griswold's intentional and systematic undercapitalization of Griswold Power left the company unable to meet the reasonably anticipated needs of the business. Indeed, Griswold Power, LLC, undertook an obligation to pay Sader, Sader Power, and SPE over $90,000,000 without the funds necessary to make good on its obligation to pay.

225.

Griswold's scheme to establish and maintain Griswold Power as an undercapitalized entity was consistent with his aim of defrauding and deceiving his creditors, including Sader, Sader Power, and SPE, into selling and delivering goods that Griswold had no intention of paying for. Upon information and belief, Griswold knew from the outset that Griswold Power would not honor its payment obligations to Sader, Sader Power, and SPE. Furthermore, Griswold knew that the undercapitalized status of the company would effectively prevent Sader, Sader Power, and SPE from enforcing those payment obligations, or would coerce them into accepting less than the full amount owed in compromise.

226.

In addition, Griswold and Griswold Power have commingled the personal funds of Griswold and the corporate funds of Griswold Power and other entities controlled by Griswold himself. For example, Griswold diverted the Centaurus loan funds designated and intended to pay SPE for solar arrays to his own personal use or other sources, including to the members and owners of Griswold Power for their own personal use.

227.

RESERVED

228.

In addition, Griswold and Griswold Power have failed to observe necessary corporate formalities in the operation of the company.

229.

RESERVED

230.

As alleged herein, Griswold has failed to conduct business on a corporate footing to such an extent that Griswold Power has become indistinguishable from the individual Griswold.

231.

Accordingly, Griswold should be held personally liable for Griswold Power, LLC's payment obligations to Sader, Sader Power, and SPE. Additionally, Griswold is jointly and severally liable to Sader, Sader Power, and SPE for all damages as alleged herein, in an amount to be determined at trial of this matter, resulting from the acts and omissions of Griswold Power.

## JURY DEMAND

232.

Plaintiffs are entitled to and demand a trial by jury on all counts so triable.

WHEREFORE, Petitioners Jon Sader, Sader Power LLC, and Sader Power Enterprises LLC, pray as follows: (1) that after due proceedings there be a judgment entered in favor of Plaintiffs and against Defendants, including against Griswold personally, awarding all damages as alleged herein, including attorneys' fees and costs.

Jointly and respectfully submitted:

BABCOCK PARTNERS, LLC

**Stephen Babcock** (26792)
**Chase Tettleton** (32721)
10101 Siegen Lane, Suite 3C
Baton Rouge, LA 70810
(225) 344-0911
(225) 761-9088 (fax)
*sb@babcockpartners.com*
*ct@babcockpartners.com*
ATTORNEYS FOR SADER POWER, LLC; SADER POWER
ENTERPRISES, LLC; AND JON SADER

-and-

GORDON, ARATA, McCOLLAM,
DUPLANTIS & EAGAN LLC


**Steven W. Copley** (16869)
**Nina W. English** (29176)
**Phillip J. Antis, Jr.** (29067)
201 St. Charles Ave., 40th Floor
New Orleans, LA 70170
(504) 582-1111
(504) 582-1121 (fax)
*scopley@gordonarata.com*
*pantis@gordonarata.com*
*nenglish@gordonarata.com*
ATTORNEYS FOR SADER POWER, LLC; SADER POWER
ENTERPRISES, LLC; AND JON SADER